UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER SIEBERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11CV1330 CDP |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision

denying Jennifer Siebert's application for disability insurance benefits under Title

II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and supplement security

income benefits based on disability under Title XVI of the Act, 42 U.S.C. § 1381

et seq. Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review

of the Commissioner's final determination. Siebert alleges that she is disabled

because of bipolar disorder, cervical spinal stenosis, lower back disc problems,

and degenerative disc disease. Because I find that the decision denying benefits

was not supported by substantial evidence, I will reverse the decision of the

Commissioner.

## Procedural History

Siebert filed her application for benefits on May 20, 2008.  The claim was initially denied on August 28, 2008.  Siebert appealed the denial of her claim, and a hearing was held before an Administrative Law Judge on December 17, 2009.  The ALJ denied Siebert's claim on April 1, 2010.  On May 31, 2011, the Appeals Council of the Social Security Administration denied Siebert's request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the Administrative Law Judge

### Application for Benefits

In her application for benefits, Siebert stated that she was born in 1971 and became disabled beginning on August 6, 2006 due to bipolar disorder, cervical spinal stenosis, lower back disc problems, and degenerative disc disease.  Siebert reported being irritable, experiencing long periods of depression where she would not get out of bed or bathe, and having suicidal thoughts.  She also stated that she had back pain with muscle spasms and difficulty with sitting, standing, twisting, and bending her neck.  Siebert claimed that she had a loss of balance which caused her to drop things and stumble or fall over.[1]

---

[1]This form was completed for Siebert by a social security interviewer, who reported that Siebert had obvious difficulty walking and used a cane to help her walk.  The interviewer also noted that Siebert shifted often while seated and stood up to move around several times during the interview.

Siebert completed a supplemental questionnaire in support of her application on June 9, 2008. She reported an inability to get out of bed as a result of her bipolar disorder and a susceptibility to fits of rage and crying. Siebert said she could do laundry, use a dishwasher, infrequently make her bed, iron clothes, take out the trash using a cart, and go to the bank and post office. However, she claimed that she was unable to vacuum or sweep, mow the lawn, rake leaves, or garden. Siebert shopped for groceries once or twice a week, but she claimed it took her one to two hours to bring them into the house. Siebert stated that she was unable to sit for 30 minutes without getting up to move around, but she was able to recline for a two hour period.

Siebert also completed a disability form in connection with her appeal on November 4, 2008. In it, she complained of headaches of increasing intensity and increased depression which affected her ability to get out of bed, bathe, groom, or leave the house.

Siebert's mother, Verna Siebert, completed a third party disability function report filed in connection with her daughter's claim. Verna stated that Siebert "does her best" to drive her to her doctor and chemotherapy appointments, but it "puts her in pain." She stated that Siebert cooked simple meals (like frozen dinners or sandwiches) weekly, did laundry, and washed dishes once a month, but

she could not vacuum or do any yard work.  Verna said that she and Siebert "took

care of each other." Verna also said that it took Siebert two days to recover after

grocery shopping.  Verna reported that her daughter was easily upset (especially

when she was stressed or experienced a change in her routine) and irritable, had

crying spells and sudden mood swings, and talked frequently about suicide.  She

also said that her daughter "is in pain at all times, no matter what she tries to do."

<u>Medical Records</u>

Primary care physician Tim E. Baker, M.D., has treated Siebert since

January 28, 2000 for chronic pain due to back problems and depression.  On July

11, 2001, Siebert saw Dr. Baker for suicidal thoughts, decreased appetite, and

crying spells.  Dr. Baker observed her affect to be tearful and prescribed her

Prozac.  On a follow-up visit on August 3, 2001, Siebert reported feeling "pretty

good" on the Prozac with improved symptoms.

On December 7, 2001, Siebert saw Dr. Baker about a lumbar spasm.  She

told him that her low back pain had increased and radiated down the sides of her

legs.

On March 15, 2002, Siebert told Dr. Baker that her depression had

increased and that she had frequent crying spells, feelings of hopelessness, and

thoughts of death.  Dr. Baker diagnosed Siebert with major depression and took

- 4 -

her off Prozac and prescribed Effexor and Seroquel instead.  On July 29, 2002, Dr. Baker noted that Siebert's mood had improved but she still had back pain.

On February 26, 2003, Siebert reported anxiety attacks, crying spells, and increased sleep.  Dr. Baker diagnosed Siebert with anxiety disorder and increased her dosage of Effexor.  On June 18, 2003, Siebert complained to Dr. Baker of depressed mood, inability to sleep, persistent crying, irritability, and suicidal thoughts.  Dr. Baker noted a depressed mood and tearful affect, so he increased the dosage of her medications.  Siebert reported that her mood had improved with the increased medication on August 29, 2003.

On February 9, 2004, Siebert complained of pain and muscle spasms in her lower back that extended down her right leg.  Dr. Baker observed a decreased range of motion in the lumbar spine and muscle spasms.  He prescribed Mobic in addition to her Flexeril and renewed her prescription for Vicodin.  On March 29, 2004, Dr. Baker noted that Siebert had been attending physical therapy and using a Transcutaneous Electrical Nerve Stimulation (TENS) unit, and that her pain had decreased somewhat.  However, Siebert still had pain in her lower back, right hip, and right leg on April 30, 2004.  On January 13 and 27 of 2005, Siebert told Dr. Baker that she continued to have back pain that extended down her right leg and foot.

On July 11, 2005, Georgia Jones, M.D., conducted a psychological evaluation of Siebert.  Dr. Jones diagnosed her with major affective disorder (depression, recurrent).  Dr. Jones found Siebert's concentration, persistence, and pace to be diminished and noted that Siebert had become "somewhat socially isolated and withdrawn."  The last page of this report is missing from the administrative record and was not available to the ALJ.  However, Dr. Jones did state that Siebert had a mental disability preventing her from working and that it was of twelve or more months in duration.

An MRI of Siebert's lumbar spine was taken on October 5, 2005 and revealed degenerative disc disease and facet changes with some areas of neural foraminal narrowing, but no spinal stenosis.

Siebert continued to see Dr. Baker for back pain.  On September 16, 2005, Siebert complained of increased lower back pain which radiated down both legs and feet.  Dr. Baker diagnosed Siebert with osteoarthritis on March 27, 2006 after she saw him for knee pain.  Siebert saw Dr. Baker again in September for her worsening back pain.  Dr. Baker observed further decreased range of motion in the lumbar spine.

Siebert received regular psychiatric treatment at Psych Care Consultants from January 20, 2004 through October 17, 2006.  During that time, Siebert was

prescribed Xanax, Effexor, Nortriptyline, and Seroquel.  On January 30, 2004,

Siebert reported that she had run out of Seroquel and was experiencing mood

swings, daily crying spells, and a decreased "ability to enjoy."  She was also

having trouble sleeping.  Siebert was "improved" and "more stable" on March 12,

2004.  On October 8, 2004, Siebert was noted to be stable.  However, on March 7,

2005, Siebert reported increased back pain, depressed mood, decreased energy

and "ability to enjoy," and increased tension and worry.  By June 13, 2005,

Siebert's mood was unstable, she was sleeping 10 or more hours per night, and

her energy and "ability to enjoy" were further decreased.  These symptoms

persisted on September 20, 2005, except that her energy had increased.  In January

and July of 2006, Psych Care Consultants reported that Siebert's mood was stable.

But on September 19, 2006, Siebert had decreased mood and motivation as well

as a tearful affect.  Her symptoms were improved by October 17, 2006.

Siebert had an MRI of her cervical spine on September 27, 2006, which

revealed degenerative disc disease with some areas of disc protrusion and spinal

stenosis from the C2-3 level through C6-7.

On January 18, 2007, Siebert had a consultative examination with

neurosurgeon James Robert Howe, M.D.  Dr. Howe noted a long history of

chronic back pain radiating primarily to the right leg and previous treatments of

epidural steroid injections, physical therapy, medications, and a TENS unit.  After reviewing her most recent MRI, Dr. Howe felt that Siebert was not a candidate for spinal surgery.

On February 12, 2007, Siebert underwent a psychological consultative examination with Paul W. Rexcoat, Ph.D.  Dr. Rexcoat diagnosed Siebert with major depression, recurrent, moderately well controlled with medications and assessed a GAF score of 60.[2]  Dr. Rexcoat noted that Siebert reported occasional mood swings, passive suicidal ideation, and feelings of depression, even while on medication.  Dr. Rexcoat found Siebert of average intelligence with the ability to understand and remember simple instructions.  He concluded that she "can sustain concentration and persistence with simple tasks.  She has mild limitations in her ability to interact socially.  She can perform simple basic activities of daily living."  Dr. Rexcoat listed her prognosis as "guarded" and determined that Siebert had a mental disability of an expected duration of 12 or more months.  He did not review her medical records.

On March 19, 2007, Siebert saw Anthony H. Guarino, M.D., for an initial

_____

[2]A GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. revision 2000)(DSM-IV-TR).  A GAF of 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning.  Id.

pain management evaluation.  She told him that she stumbled when walking for the past two to three years.  Dr. Guarino concluded based on physical examination and MRI reports that Siebert had "pressure on her spinal cord that is altering her function."  Dr. Guarino questioned Dr. Howe's assessment and thought Siebert might need to be evaluated by a neurosurgeon from Washington University.  On May 11, 2007, Siebert reported that her back pain improved with the use of ice and the TENS unit, but that it worsened when walking, sitting, or climbing stairs. Siebert had epidural injections for pain on May 11, 2007 and June 7, 2007.

On January 4, 2007, Dr. Baker wrote that Siebert's chronic lower back pain was at "maximum improvement."  During an examination on February 7, 2007, Dr. Baker noted that Siebert complained of neuropathy in her upper extremities. On May 8, 2007, Siebert again reported lower back pain radiating down her right leg.  Dr. Baker changed her prescription of Effexor to Cymbalta on July 6, 2007, because of a change in her insurance coverage.

In a "To Whom It May Concern" letter dated May 16, 2007, Dr. Baker opined as follows:

> Jennifer Siebert has been a long term patient of my practice who suffers from chronic disabling pain due to degenerative disc disease of the cervical and lumbar spine.  The purpose of this letter is to clarify her current medical status.
>
> Ms. Siebert was first evaluated in 2002 with complaints of severe

low back pain with radiation into both lower extremities.  MRI done at that point confirmed significant degenerative disc and facet changes of the lumbar spine.  She was evaluated by neurosurgeons at that point that felt no surgical intervention would be of benefit.  She was subsequently treated with physical therapy, epidural steroid injections, and anti-inflammatories.  The patient had limited benefit from these modalities.  She has subsequently sought second opinions with similar results.  Currently the patient has settled into a pattern of chronic pain with occasional flairs that necessitate the use of intermittent steroid therapy and narcotic pain medication.

Due to the patient's persistent pain, I do not find her able to work.  It is apparent that depression has become a complicating issue with her chronic pain syndrome.  This proves to be equally disabling.

In September of 2006, the patient began to develop difficulty with upper extremity dysesthesias as well as pain.  MRI of the cervical spine showed multiple level disc osteophyte complexes with some areas of disc protrusion leading to canal stenosis from C-2, C-3 through C-6, C-7.  There is also evidence of resultant muscle spasm at these levels.  The patient is currently undergoing further evaluation and is about to initiate fluoroscopic guided C-spine injections in an attempt to alleviate these symptoms.  Given her marginal response to epidural steroid injections of the lumbar spine, I'm not sure how much benefit she will derive from these.

My final impression is that Jennifer Siebert remains chronically disabled from her spinal problems and that this condition will be persistent throughout the course of her life and will likely slowly progress over time.

During a follow-up visit with Dr. Guarino on May 22, 2008, Siebert was

"educated to use a cane to help prevent injury from her problem."

On April 17, 2008, Siebert told Dr. Baker that she had fallen two weeks

before and had increased neck, back, and leg pain since that time.  Siebert also

reported mood swings during the visit.  Dr. Baker diagnosed depression with

possible bipolar disorder.  On May 23, 2008, Dr. Baker prescribed Siebert with

Buspirone for irritable mood.  She still had a depressed affect on July 15, 2008.

Dr. Baker continued to prescribe medications for Siebert's chronic pain, including

Percoset and MS Contin, through February 9, 2009.

Siebert saw Riaz A. Naseer, M.D. for a neurological consultative evaluation

on August 16, 2008.  Dr. Naseer's clinical impression was that Siebert suffered

from cervical stenosis and chronic low back pain.  Dr. Naseer found her

neurological and physical examination to be "fairly unremarkable."

Siebert had another MRI of the lumbar and cervical spine on November 20,

2008.  The cervical MRI revealed "extensive" degenerative disc disease, including

moderate to severe right neural foraminal narrowing and moderate left neural

foraminal narrowing at C5-6 secondary to disc bulging.  The lumbar MRI

revealed mild to moderate degenerative disc disease at L5-S1 and L4-5.

Dr. Baker completed a physical medical source statement for Siebert's

disability claim on February 5, 2009.  Dr. Baker believed that Siebert should use a

cane and would have balancing limitations due to lower extremity weakness

caused by her degenerative disc disease.  Dr. Baker opined that Siebert could sit

for a total of two hours, and stand and walk for a total of ninety minutes or less.

Dr. Baker stated that Siebert could only lift from two to five pounds occasionally,

and that she should rarely stoop, crouch, crawl, or climb ladders and scaffolds.

Dr. Baker confirmed that Siebert suffered from constant pain which was verified

by muscle spasms, reduced range of motion, and motor disruption.  He stated that

Siebert would likely need to lie down or nap for twenty minutes in a normal

workday due to her pain and medications, and she would need to take breaks

every hour because of her need to change positions frequently to alleviate pain.

Dr. Baker indicated that Siebert's limitations lasted for twelve months or more at

the assessed severity.

Dr. Baker also completed a mental medical source statement on the same

date.  Dr. Baker listed Siebert's mental impairment as bipolar disorder with an

onset date of July 2002.  He indicated that Siebert had marked limitations to cope

with normal work stress, accept instructions, respond to criticism, and perform at

a consistent pace.  Dr. Baker also found that Siebert had moderate limitations in

her ability to function independently, behave in an emotionally stable manner,

understand and remember simple instructions, make simple work-related

decisions, maintain attention to work tasks for up to two hours, sustain an ordinary

routine without special supervision, respond to changes in a work setting, and

work in coordination with others.  Siebert had only mild limitations in her ability

to relate in social situations, interact with the general public, and maintain socially

acceptable behavior.  Dr. Baker believed Siebert's mental impairment would

cause hourly unpredictable interruptions at work and would prevent her from

returning to work for at least 20 minutes after each interruption.  He concluded

she would arrive late to work three times per week and miss work 10 days per

month.  Like her physical impairments, Dr. Baker also believed Siebert's mental

impairments would last at least 12 consecutive months and were cyclical in nature,

"meaning that the patient's symptoms vary in severity over time."  He indicated

Siebert's lowest GAF score in the previous year was 30, with the highest being

40.[3]

On April 30, 2008, Siebert was evaluated by psychiatrist Roomana Arain,

M.D., at Psych Care Consultants.  Dr. Arain's diagnostic impression from this

initial visit was bipolar affective disorder, probable type II, anxiety disorder not

otherwise specified, rule out generalized anxiety disorder, and history of

methamphetamine and cannabis dependence in full remission.  Dr. Arain assessed

a GAF score of 60.  On May 25, 2008, Dr. Arain observed Siebert's mood to be

---

[3]A GAF of 21 to 30 is characterized as behavior considerably impaired in
communication or judgment (such as suicidal preoccupation) or the inability to function in
almost all areas.  Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. revision
2000)(DSM-IV-TR).  A GAF of 31 to 40 is characterized as major impairment in several areas,
such as work or school, family relations, judgment, thinking, or mood.  Id.

sad, with a dysphoric and tearful affect.  On June 25, 2008, Dr. Arain described

Siebert's mood as hyper and her affect as euthymic.  On August 28, 2008, Siebert

was "down" and anxious, with a dysphoric and tearful affect.  On September 23,

2008, Siebert complained to Dr. Arain of increased anxiety and panic attacks.  She

was observed by Dr. Arain to be depressed and anxious, with a dysphoric and

tearful affect.  Siebert saw Dr. Arain again on February 10, 2009 and reported

continued depression, irritability, and increased anxiety.  Dr. Arain found

Siebert's mood to be depressed and her affect incongruent to mood.

Dr. Arain completed a mental medical source statement in connection with

Siebert's application for benefits on February 17, 2009.  In activities of daily

living, Dr. Arain opined that Siebert would have marked limitations in her ability

to cope with normal work stress and to behave in an emotionally stable manner.

In social functioning, Dr. Arain stated that Siebert would have extreme limitations

in her ability to relate in social situations and to interact with the general public.

In concentration, persistence, and pace, Dr. Arain found that Siebert would have

an extreme limitation in her ability to respond to changes in a work setting, and

marked limitations in her ability to make simple work-related decisions, maintain

attention to work tasks for up to two hours, perform at a consistent pace, and work

in coordination with others.  Like Dr. Baker, Dr. Arain also believed that Siebert

- 14 -

would have unpredictable interruptions during a normal workday or week, that her bipolar disorder was cyclical in nature with varied symptoms over time, and that the limitations had existed at least since the date she first starting treating her.

Siebert saw Dr. Arain again on April 16, 2009.  At that time, Siebert said she was struggling with daily suicidal thoughts and felt very sad, irritable, anxious, and hopeless.  Her mood was depressed, her affect was dysphoric and tearful, she had limited insight and judgment, and she was paranoid.  Because Siebert was unable to tell Dr. Arain that she would not harm herself, Dr. Arain sent her to St. John's Mercy Medical Center for evaluation.  Once there, the staff noted that her mood was depressed, her affect was restricted, and she seemed overwhelmed.  Siebert was diagnosed with bipolar disorder, recent episode depressed, and was assigned a GAF score of 25.  Siebert was admitted and placed on suicide watch and fall precaution.  By April 28, 2009, Siebert's mood had stabilized and she was discharged.  At that time, Siebert was doing "fairly well" with "improving" mood.  Her discharge diagnosis was bipolar disorder, most recent episode depressed.

Siebert continued to receive regular psychiatric care from Dr. Arain after she was discharged.  On May 12, 2009, she saw Dr. Arain for a follow-up visit after her hospital stay.  Siebert's medications had been adjusted while she was in

the hospital, but she told Dr. Arain that she still felt very anxious, had panic

attacks,  and was depressed.  Her mood was depressed and anxious and her affect

was dysphoric and tearful.  Dr. Arain recommended one-on-one counseling.  On

June 11, 2009, Siebert told Dr. Arain that she had seen Dr. Long for counseling

and that her depression and anxiety seemed better.

However, on July 23, 2009, Siebert reported that she had been severely

depressed for over two weeks and that she had suicidal thoughts coupled with a

plan to overdose on pills.  Dr. Arain noted that her mood was depressed and her

affect was blunted.  Dr. Arain again recommended that Siebert be transferred to

the hospital for safety and stabilization.  Siebert was admitted to St. John's

hospital the same day.  She described her recent suicidal thoughts and reported

that she had taken a handful of pills four days prior to admission.  She also stated

that she was feeling hopeless, eating too much, and gaining weight.  Siebert also

reported irritability and anxiety.  Siebert was diagnosed on admission with bipolar

affective disorder, depressed, and was assigned a GAF score of 30.  She was again

placed on suicide watch and treated with medication and group therapy.  Siebert's

condition eventually stabilized and she was discharged from the hospital on

August 10, 2009.

Siebert was treated by Dr. Arain after being released from the hospital.  On

August 25, 2009, Siebert told her that she was feeling better and her mood and affect were noted to be improved.  On September 24, 2009, Siebert told Dr. Arain that she was feeling more level, but was still having disrupted sleep and feeling tired during the day.  On October 22, 2009, Siebert reported that she was doing well overall except that she was still having days where she felt down and weepy. She also told Dr. Arain that she continued to experience sleep disruptions.

Siebert continued to be treated by Dr. Baker as well.  He refilled her pain medications at regular visits from December of 2008 through September of 2009.

<u>Testimony</u>

A hearing before an ALJ was held on Siebert's disability claim  on December 17, 2009.  Siebert was represented by counsel at the hearing and testified.  She told the ALJ that she was 38 years old and had an 11th grade education.  She is 5'8" tall and weighed 239 pounds at the time of the hearing. She does not have a GED.  She previously worked as a cashier, pad printer, and fast food worker.  Siebert lives with her mother, who has ovarian cancer.  Her mother dresses and bathes herself, but Siebert "make[s] sure she eats, gets her water, and just, you know, she lays down and watches TV and sleeps . . . ." Siebert grocery shops for both of them, but she carries the bags into the house one at a time.  Siebert drives and takes her mother to her doctor's appointments.

- 17 -

Siebert and her mother share the housework.  Siebert cooks easy meals, puts

dishes in the dishwasher, and laundry.  Her niece vacuums the floors, and a

neighbor does their yard work.  Siebert has a dog, but she doesn't take him for

walks anymore.  Siebert likes to watch movies and send emails.  Siebert testified

that she can only walk for about a half hour at a time and stand for about the same

amount of time.  She can sit for about 20 minutes but recline for a longer period of

time.  Siebert told the ALJ that she could only lift about a gallon of milk.  She still

smokes, but no longer drinks alcohol except for an occasional beer.  She quit

using illegal drugs eight years before the hearing.

When asked about her medical conditions, Siebert said that she had two

lower lumbar bulging discs.  She uses a cane upon her doctor's advice.  She had

pain injections in her back for over a year, and uses a TENS unit twice a week.

She also testified that she has muscle spasms in her back and cervical spinal

stenosis in her neck.  Siebert testified that she takes four daily pain medications,

and the only time she can really find comfort is when she is reclining.

Siebert testified that she has bipolar disorder.  She described her symptoms

as depression, suicidal thoughts with suicidal attempts, inability to get out of bed,

crying spells, severe anger, disrupted sleep, and severe mood swings.  She

testified that she still has these symptoms, but that the medication and counseling

- 18 -

have been helpful.  She stated that she has attempted to take her own life four

times, and ended up in the hospital after three of those attempts.  She sees a

psychiatrist and a counselor monthly, and takes prescription medications.

Siebert also said she suffers from anxiety.  She described an anxiety attack

like a heart attack, with pain in her upper chest, trouble breathing, and pain in her

arm.  She said that she currently has two to three anxiety attacks per week.  She

has no idea what triggers the attacks, and she is taking Respidol for her anxiety.

Her medications were changed because they stopped working and were addictive.

She also has trouble sleeping due to her bipolar disorder and pain.  She testified

that "right now I haven't been able to sleep in the past two weeks, a full night."

A vocational expert also testified at the hearing.  The ALJ posed the

following hypothetical question to the expert:

> I want to assume a hypothetical individual with the claimant's
> education, training, work experience.  Further I want to assume the
> individual can perform light work with the following limitations:
> climb stairs and ramps occasionally, climb ropes, ladders, scaffolds
> never.  This individual can stoop, kneel, crouch occasionally.  Never
> crawl.  This individual must avoid extreme cold and vibrations.  And
> wetness.  Additionally this individual can understand, remember,
> carry out at least simple instructions, non detailed tasks, demonstrate
> adequate judgment to make simple work related decisions.  Can
> perform repetitive work according to set procedures, sequence, and
> pace.  Are there any of the light jobs in past jobs that she could still
> do?

The vocational expert answered in the affirmative, pointing to fast food worker

and convenience store clerk.  The ALJ then added the additional limitations of

"sit/stand option with the ability to change positions frequently at the work site."

The vocational expert said a person with those additional limitations could be a

cashier.  For his third hypothetical, the ALJ added the following limitations:

> [This individual] will not be able to maintain concentration and
> attention for two hour segments over an eight hour period; will have
> crying spells daily, which could impact not only her, but coworkers.
> And needs two additional breaks plus the regular two breaks and a
> lunch hour.  Would that individual be able to perform the jobs that
> you gave me for hypothetical two?

The vocational expert answered, "No."

## Legal Standard

A court's role on review is to determine whether the Commissioner's

findings are supported by substantial evidence on the record as a whole.  Gowell

v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a

preponderance, but is enough so that a reasonable mind would find it adequate to

support the ALJ's conclusion.  Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir.

2000).  As long as there is substantial evidence on the record as a whole to support

the Commissioner's decision, a court may not reverse it because substantial

evidence exists in the record that would have supported a contrary outcome, id., or

because the court would have decided the case differently.  Browning v. Sullivan,

958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is

substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe

- 22 -

impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

The Commissioner has supplemented the five-step sequential process with regulations dealing specifically with mental impairments.  20 C.F.R. § 404.1520a. First, the Commissioner must evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable impairment; and specify such symptoms, signs, and laboratory findings substantiating the presence of such impairment.  20 C.F.R. § 404.1520a(b)(1).  The Commissioner then must determine the severity of the impairment.  To do so, the Commissioner is required to rate the degree of functional loss the claimant suffers as a result of the impairment in the areas of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).

> When we rate the degree of limitation in the first three functional
> areas (activities of daily living; social functioning; and concentration,

> persistence, or pace), we will use the following five-point scale:
> None, mild, moderate, marked, and extreme.  When we rate the
> degree of limitation in the fourth functional area (episodes of
> decompensation), we will use the following four-point scale: None,
> one or two, three, four or more . . . .
>
>                                    . . .
>
> If we rate the degree of your limitation in the first three functional
> areas as "none" or "mild" and "none" in the fourth area, we will
> generally conclude that your impairment(s) is not severe . . . .

20 C.F.R. § 404.1520a(c)(4)-(d)(1).

If the mental impairment is determined to be "severe," the Commissioner

must then determine if it meets or equals a listed mental disorder.  20 C.F.R. §

404.1520a(d)(2).  This is done "by comparing the medical findings about [the]

impairment(s) and the rating of the degree of functional limitation to the criteria of

the appropriate listed mental disorder."  Id.  If the severe impairment does not

meet or equal a listed mental disorder, the Commissioner then performs an RFC

assessment.  20 C.F.R. § 404.1520a(d)(3).  At the initial and reconsideration steps

of the administrative process, the Commissioner must complete a standard

document outlining the steps of this procedure.  At the hearing and Appeals

Council levels, application of the procedure must be documented in the written

decision.  20 C.F.R. § 404.1520a(e).

> The decision must show the significant history, including
> examination and laboratory findings, and the functional limitations
> that were considered in reaching a conclusion about the severity of

> mental impairment(s).  The decision must include a specific finding
> as to the degree of limitation in each of the functional areas described
> in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).  The Commissioner's failure to follow the

appropriate procedure in determining the severity of a claimant's mental

impairment requires a remand.  Pratt v. Sullivan, 956 F.2d 830, 834 (8th Cir.

1992).

When evaluating evidence of pain or other subjective complaints, the ALJ

is never free to ignore the subjective testimony of the plaintiff, even if it is

uncorroborated by objective medical evidence.  Basinger v. Heckler, 725 F.2d

1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's

subjective complaints when they are inconsistent with the record as a whole.  See

e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  In considering the

subjective complaints, the ALJ is required to consider the factors set out by

Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> the claimant's prior work record, and observations by third
> parties and treating and examining physicians relating to such
> matters as: (1) the claimant's daily activities; (2) the duration,
> frequency and intensity of the pain; (3) precipitating and
> aggravating factors; (4) dosage, effectiveness and side effects
> of medication; [and] (5) functional restrictions.

Id. at 1322.  When an ALJ explicitly finds that the claimant's testimony is not

credible and gives good reasons for the findings, the court will usually defer to the

ALJ's finding.  Casey v. Astrue 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ

retains the responsibility of developing a full and fair record in the non-adversarial

administrative proceeding.  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir.

2002).

### The ALJ's Findings

The ALJ denied Siebert's claim for benefits in a written decision dated

April 1, 2010.  The ALJ found that Siebert suffered from severe impairments of

degenerative disc disease of her cervical spine and lumbar spine, spinal stenosis,

hypertension, bipolar affective (mood) disorder, and an anxiety disorder, but that

these impairments or combination of impairments did not meet or medically equal

one of the listed impairments.   The ALJ then concluded that Siebert had the

residual functional capacity to perform light work, except that she must have a

sit/stand option with the ability to change her position frequently, she can

occasionally climb stairs and ramps, stoop, kneel, and crouch, she should never

climb ropes, ladders or scaffolds, or crouch, she must avoid concentrated exposure

to extreme cold, wetness, and vibrations, she can understand, remember, and carry

out at least simple instructions and non-detailed tasks, she can use adequate

judgment to make simple work-related decisions, and she can perform repetitive

work according to set procedures, sequence, or pace.

In reaching this conclusion, the ALJ found that Siebert's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 and 12.06.  He concluded the "paragraph B" criteria were not satisfied because Siebert had no more than mild restrictions on her activities of daily living.  He decided that Siebert had the ability to respond to changes, deal appropriately with stress, avoid hazards and maintain safe behavior, follow rules, adhere to schedules and time constraints, and travel to unfamiliar places.  He concluded that most of the limitations on daily living described by Siebert "are attributed to her physical condition."  The ALJ also found that Siebert had no more than moderate restrictions in social functioning because she was able to get along with others and did not have a history of altercations or difficulties with interpersonal interactions at work.   He stated: "Most of her mental status examinations are unremarkable and do not reflect withdrawal, bizarre or unusual behavior, emotional lability, paranoid ideas, or faulty insight or judgment.  Her observed behavior when hospitalized and during checkups is generally unremarkable."  The ALJ believed that Siebert had moderate difficulties with concentration, persistence, or pace, but he noted that she did not miss her doctor's appointment or forget to take her medications.  Although the ALJ did find that Siebert experienced two episodes of decompensation as reflected by her

psychiatric hospitalizations, he concluded that "[t]he treatment note from September 25, 2009 indicates that she was feeling better after her hospitalization." Therefore, the ALJ did not find that Siebert's mental impairments caused at least two marked limitations or one marked limitation and repeated episodes of decompensation sufficient to satisfy the paragraph B criteria.

The ALJ determined Siebert's mental residual functional capacity as follows:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

> These findings are consistent with the report from the psychiatric evaluation completed by Georgia Jones, M.D. on July 11, 2005. Medications were helping a lot. She described how she quit her job in March of April 2005 because her family doctor told her to apply for disability because of her bad back and did not authorize her to return to work. She 'drives a lot.' One psychosocial stressor was caring for her mother.

> These findings are consistent with the report from the psychological evaluation completed by Paul W. Rexcoat, Ph.D., on February 12, 2007. Her condition was described as major depression, recurrent and moderately well controlled with medications.

- 28 -

The claimant had voluntary psychiatric hospitalizations April 16-28, 2009 and July 23-August 10, 2009.  The hospital reports indicate that she was hospitalized with suicidal thoughts, was closely monitored in the hospital and her medications adjusted until her condition stabilized and she was released and followed on an outpatient basis. Exhibit B22F/3 indicates that she was hospitalized while experiencing suicidal attempts but before an attempt.  She was doing better on her medications but reported additional pain and could not find a neurosurgeon who accepted Medicaid.  On October 22, 2009, she reported that overall, she was doing well, except for the days when she felt down and she went to sleep late and woke up late, otherwise she denied any depressive symptoms.  There was no evidence of mania or psychosis.  She denied any suicidal thoughts. She denied any use of alcohol or illicit drugs.  There were no other concerns at that time.

In discussing Siebert's physical limitations, the ALJ relied on the report of consulting neurosurgeon Dr. Howe, who saw Siebert once on January 18, 2007 and concluded that she was not a candidate for spinal surgery.  He also reviewed Dr. Guarino's records and concluded that Siebert's pain was adequately controlled with medication and injections.  Although the ALJ mentions Dr. Baker's letter of May 16, 2007, he does not discuss it or explain what weight, if any, he afforded to Dr. Baker's opinion that Siebert was unable to work because of chronic disabling back pain complicated by depression and chronic pain syndrome.  The ALJ also discusses the consultative report from Dr. Naseer, a neurosurgeon who examined Siebert on August 18, 2008.  The ALJ discussed Dr. Baker's records and reports as follows:

Dr. Baker completed an assessment of the claimant's mental
limitations and indicated that she had been virtually incapacitated
since July 2002. Since she was working at that time, it is difficult to
afford much weight to this assessment.

The record includes a number of reports from Dr. Baker. In Exhibits
B6F, Dr. Baker reports that the claimant is disabled because of pain
and left arm weakness in January 2007. However, none of the other
examinations identified left arm weakness. Exhibit B9F indicates
that many of the medications prescribed by Dr. Baker worked well or
provided effective relief, but were not covered by her insurance. On
February 5, 2009, Dr. Baker described the claimant's physical
limitations. These limitations appear to be based upon pain that the
pain management specialist described as well controlled with
medications and are contrary to the examining neurologist's
conclusions.

The ALJ discusses Dr. Arain's records and evaluations as follows:

A treating psychiatrist completed Exhibit B17F on February 10,
2009. This was during a period when the claimant was experiencing
increased symptoms and ultimately experienced two psychiatric
hospitalizations. However, the record does not indicate that the
claimant's symptoms persisted at this level for at least 12 consecutive
months. It took a few months and two hospitalizations to stabilize
her mood and symptoms, but her condition did stabilize, consistent
with her residual functional capacity. As noted in this decision, she
remained able to drive and to care for her mother. A person with
these symptoms described in this exhibit would not be able to
perform either activity.

The ALJ concluded that Siebert's statements concerning the intensity,

persistence, and limiting effects of her symptoms were not entirely credible. In

doing so, he relied on the fact that she took care of her mother "without much

assistance" because "[t]he record does not indicate that the claimant receives any

- 30 -

assistance from family or friends to care for her mother or that assistance had been offered or provided by an outside agency." The ALJ decided that Siebert's allegations of pain were not consistent with the consultative examinations by the neurosurgeon and the neurologist. He concluded that her allegations of pain "are not afforded much weight because the alleged level of impairment is inconsistent with the preponderance of the evidence as a whole. Of note, she worked with many of these symptoms." The ALJ also discounted Dr. Arain's and Dr. Baker's opinions because they "appeared to rely heavily upon the claimant's reports of symptoms that were not consistent with the objective findings, especially by the examining neurologist. She had a period when the symptoms of her medically determinable mental impairments deteriorated but her condition stabilized after two hospitalizations."

The ALJ concluded that Siebert was not able to return to her past relevant work, but he relied on the vocational expert's testimony in finding that she could work as a cashier or ticket taker. For these reasons, the ALJ determined that Siebert was not disabled. This appeal followed.

## **Discussion**

Siebert contends that the ALJ erred in evaluating the opinions of her treating physicians. "It is the ALJ's function to resolve conflicts among the

various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725

(8th Cir. 2002) (internal quotation marks and citation omitted).  When considering

professionals' opinions, the ALJ must defer to a treating physician's opinions

about the nature and severity of a claimant's impairments, "including symptoms,

diagnosis, and prognosis, what an applicant is capable of doing despite the

impairment, and the resulting restrictions." Ellis v. Barnhard, 392 F.3d 988, 995

(8th Cir. 2005) (internal citation omitted).  A treating physician's opinion

regarding a claimant's impairment will be granted controlling weight, provided

the opinion is well-supported by medically acceptable clinical and laboratory

diagnostic techniques, and is not inconsistent with the other substantial evidence

in the record.  Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  While a

treating physician's opinion is usually entitled to great weight, it does "not

automatically control, since the record must be evaluated as a whole." Bentley v.

Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995). After reviewing the record as a

whole, an ALJ may discount or disregard a treating physician's opinion if other

medical assessments are supported by better or more thorough medical evidence,

or where a treating physician gives inconsistent opinions that undermine the

credibility of the opinions.  See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir.

2000).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, with such factors including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's are of speciality.  20 C.F.R. § 404.1527(c).

Dr. Baker has been Siebert's treating physician since 2000.  On May 16, 2007, Dr. Baker stated that Siebert was unable to work because of "chronic disabling pain due to degenerative disc disease of the cervical and lumbar spine." He noted that her back problems were persistent, progressive, and had worsened over time.  He based his opinion on: physical examinations which revealed muscle spasms, reduced range of motion, and motor disruption; diagnostic and laboratory findings, including MRI results; and, Siebert's treatment history, which included physical therapy, epidural steroid injections, inflammatories, and pain medication. Dr. Baker noted at that time that Siebert was not a candidate for surgery and was undergoing fluoroscopic guided C-spine injections in an attempt to alleviate her pain and symptoms.  However, Dr. Baker doubted that Siebert would obtain much relief from these injections given "her marginal response to epidural steroid

injections of the lumbar spine."  Dr. Baker also opined that Siebert's depression

was a "complicating issue with her chronic pain syndrome" and equally disabling.

On February 5, 2009, Dr. Baker completed a physical medical source

statement in connection with Siebert's claim for benefits.  Dr. Baker stated that

Siebert needed a cane to help with balancing limitations due to lower extremity

weakness caused by her degenerative disc disease.  He opined that Siebert could

sit for a total of two hours, and stand and walk for a total of ninety minutes or less

each, lift from two to five pounds occasionally, and rarely stoop, crouch, crawl, or

climb ladders and scaffolds.  Dr. Baker confirmed that Siebert suffered from

constant pain which was verified by muscle spasms, reduced range of motion, and

motor disruption.  He stated that Siebert would likely need to lie down or nap for

twenty minutes in a normal workday due to her pain and medications, and she

would need to take breaks every hour because of her need to change positions

frequently to alleviate pain.  Dr. Baker indicated that Siebert's limitations lasted

for twelve months or more at the assessed severity.

He also completed a mental medical source statement.  In it, Dr. Baker

listed Siebert's mental impairment as bipolar disorder.  According to Dr. Baker,

Siebert had marked limitations to cope with normal work stress, accept

instructions and respond to criticism, and perform at a consistent pace.  He also

believed that Siebert had moderate limitations in her ability to function independently, behave in an emotionally stable manner, understand and remember simple instructions, make simple work-related decisions, maintain attention to work tasks for up to two hours, sustain an ordinary routine without special supervision, respond to changes in a work setting, and work in coordination with others.  Dr. Baker opined that Siebert's mental impairment would cause hourly unpredictable interruptions at work and would prevent her from returning to work for at least 20 minutes after each interruption.  He concluded she would arrive late to work three times per week and miss work 10 days per month.

Siebert began seeing treating psychiatrist Dr. Arain about once monthly on April 30, 2008.  Dr. Arain diagnosed her with bipolar affective disorder and anxiety disorder.  During these visits, Dr. Arain noted wild swings in Siebert's mood and affect, ranging from dysphoric and tearful on May 25, 2008, to hyper and euthymic just one month later.  By August, Siebert was down and anxious, with increased anxiety and panic attacks in September, and continued depression and anxiety in January of 2009.  Dr. Arain also completed a mental medical source statement for Siebert in February of 2009.  Dr. Arain opined that Siebert had marked limitations in her ability to cope with stress and behavior in an emotionally stable manner.  She also found Siebert was extremely limited in her

ability to relate in social situations, interact with the general public, and respond to changes in a work setting.  Dr. Arain rated Siebert as markedly limited in her ability to make simple decisions, maintain attention, perform consistently, and work with others.  Like Dr. Baker, Dr. Arain diagnosed Siebert's bipolar disorder as cyclical in nature with varied symptoms over time.

By Siebert's April 2009 visit with Dr. Arain, Siebert was struggling with daily suicidal thoughts, depression, dysphoric and tearful affect, limited insight and judgment, and paranoia.  For these reasons, Dr. Arain sent Siebert to the hospital, where Siebert was committed for psychiatric evaluation.  At the time of admission, Siebert's GAF score was 25.  She was hospitalized for 12 days and discharged with an "improving mood."

During her May visit with Dr. Arain, Siebert reported anxiety, depression, and panic attacks.  Dr. Arain recommended counseling, and Siebert complied.  Siebert reported improvements in June, but went back to the hospital on Dr. Arain's advice in July after again experiencing daily suicidal thoughts.  Her GAF score upon admission was 30.  After being treated with medication and group therapy, Siebert's condition was stabilized and she was discharged after eighteen days.  In August, Siebert told Dr. Arain that was feeling better, but by September she reported disrupted sleep.  On October 22, 2009, Siebert claimed she was doing

- 36 -

well except that she still felt down and weepy with sleep disruptions.

As for Siebert's physical impairments, the ALJ did not specifically discuss the weight he assigned to Dr. Baker's evaluation.  However, he appears to have discounted, if not disregarded, Dr. Baker's opinions because: Dr. Baker noted weakness in the left, rather than right, arm on one occasion; some of Siebert's medications were changed for insurance purposes; and, his conclusions were based on Siebert's description of pain, which was "contrary to the examining neurologist's conclusions."  The ALJ does not specify whether he was referring to neurosurgeon Dr. Howe's conclusion on January 18, 2007, that Siebert was not a candidate for surgery, or Dr. Naseer's August 18, 2008 conclusion that Siebert's neurological and physical examination was "fairly unremarkable."  In either case, the ALJ clearly erred by relying on a one-time consulting doctor's opinion over Dr. Baker's opinions.

Here, the ALJ failed to accord the proper weight to Dr. Baker's opinions regarding Siebert's chronic back problems.  In doing so, the ALJ did not take into account the fact that Baker had treated Siebert extensively for back problems for nearly a decade by the time of the hearing.  Dr. Baker's opinions were supported not only by his own lengthy treatment history of Siebert, but by other diagnostic and laboratory findings in the record, including her MRI results from November

20, 2008, which revealed "extensive" degenerative disc disease, including moderate to severe right neural foraminal narrowing and moderate left neural foraminal narrowing at C5-6 secondary to disc bulging.  Both Dr. Baker's medical source statement and Siebert's most recent MRI were completed after the consulting doctors rendered their opinions.  The MRI confirmed Dr. Baker's opinion that Siebert's degenerative disc disease was progressively worsening over time and had reached "maximum improvement" in January of 2007.

Dr. Baker is Siebert's treating physician, and his opinions are entitled to controlling weight if well-supported and not inconsistent with other substantial evidence in the record.  Here, Dr. Baker's opinions were consistent with MRI results and findings from treating physician Dr. Guarino, who concluded that Siebert had "pressure on her spinal cord that is altering her function."  Dr. Guarino questioned Dr. Howe's assessment and thought that Siebert should be reevaluated for spinal surgery by a different neurosurgeon.  The ALJ also improperly discounted the medical diagnoses as having been based on Siebert's recitation of events because  "a patient's report of complaints, or history, is an essential diagnostic tool."  Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997). Here, Siebert's claimed symptoms are consistent with objective tests, the nature of her disorder, and the eyewitness testimony from her mother found in the third

party disability function report.  If the ALJ had questions about some aspect of Dr.

Baker's opinion based upon the fact that he noted that Siebert had weakness in her

left arm versus her right arm, then he should have contacted Dr. Baker to provide

additional information or to clarify the record rather than simply disregarding his

opinion.  The ALJ retains the responsibility of developing a full and fair record in

the non-adversarial administrative proceeding.  Hildebrand, 302 F.3d at 838.  This

is especially true in this case, where Dr. Baker specifically stated that Siebert "has

now developed left arm symptoms."  (emphasis supplied).  That Dr. Baker,

Siebert's long-time treating physician, would note a new symptom not previously

experienced by Siebert or reported to a consulting physician during a one-time

examination does not render his opinion unreliable.  If anything, it demonstrates

the importance of placing controlling weight on the opinions of a treating

physician, whose regular examinations of the claimant and familiarity with the

claimant's history allow him to diagnose changes in the claimant's condition that

may be missed by consulting or non-examining physicians.  It was error for the

ALJ to disregard Dr. Baker's opinions on this basis.

It was also error for the ALJ to discount or disregard Dr. Baker and Dr.

Arain's opinions regarding Siebert's mental limitations.  The ALJ rejected Dr.

Arain's mental medical source statement because he did not believe that Siebert's

symptoms persisted at the level reported by Dr. Arain for at least 12 consecutive months.  He concluded that, "[a]s noted in this decision, she remained able to drive and care for her mother.  A person with the symptoms described in this exhibit would not be able to perform either activity."  There is no evidence in the record to support this finding.  Instead, the evidence showed that Siebert occasionally drove her sick mother to chemotherapy appointments or went grocery shopping when required, but she did not go out for social outings.  Siebert's mother stated that it was very hard on her daughter to perform these tasks and that it sometimes took her days to recover.  As far as taking care of her mother, Siebert testified that her duties were limited in this regard, and her mother confirmed that they both "t[ook] care of each other."  No doctor opined that a person with Siebert's limitations could not perform these limited activities.

Similarly, the ALJ decided that "it is difficult to afford much weight to [Dr. Baker's] assessment" because he indicated an onset date of July of 2002 for her bipolar disorder even though Siebert was still working at that time.  Again, the ALJ erred in discounting or ignoring Dr. Baker's opinions based upon this perceived inconsistency in one record.  Rather than opining that Siebert had been suffering from bipolar disorder at its current severity since 2002, it seems equally likely that Dr. Baker simply wrote the onset date for Siebert's diagnosis of bipolar

disorder instead of the date on which the limitations began at their current

severity.  In light of this apparent confusion, the ALJ should have sought

clarification from Dr. Baker on this important issue instead of affording his

opinion little weight.

Instead, the ALJ simply decided that "[i]t took a few months and two

hospitalizations to stabilize her mood and symptoms, but her condition did

stabilize, consistent with her residual functional capacity."  In reaching this

conclusion, the ALJ ignored the medical evidence and substituted his own opinion

for that of Siebert's physicians.  Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir.

1990).  In doing so, he clearly erred.  "Although the mere existence of symptom-

free periods may negate a finding a disability when a physical impairment is

alleged, symptom-free intervals do not necessarily compel such a finding when a

mental disorder is the basis of a claim."  Andler v. Chater, 100 F.3d 1389, 1393

(8th Cir. 1996).  "Symptom-free intervals and brief remissions are generally of

uncertain duration and marked by the impending possibility of relapse."  Id.  Here,

the ALJ ignored the evidence from Siebert's treating physician and her treating

psychiatrist that Siebert's mental impairments were cyclical in nature and varied

in severity over time.  These conclusions are overwhelmingly supported by the

record in this case, which shows that Siebert's symptoms varied greatly during her

monthly visits with Dr. Arain.  Before her first psychiatric hospitalization,
Siebert's mood and affect ranged from hyper and euthymic to suicidal during an
eleven-month period and her GAF scores plummeted from 60 to 25.  By the time
she was discharged from the hospital at the end of April, Siebert was reportedly
doing well and improving, yet by the end of July she was readmitted to the
hospital for eighteen days because she had attempted to commit suicide and was
continuing to have suicidal thoughts.  Siebert's hearing was held about four
months after Siebert was released from the hospital.  Although she told Dr. Arain
that she was doing better in October, she still reported sleep problems and feeling
down and weepy.  By the time of the hearing Siebert testified that she was
currently experiencing symptoms of depression, suicidal thoughts, inability to get
out of bed, crying spells, severe anger, severe mood swings, and disrupted sleep,
including not being able to sleep a full night in the two weeks before the hearing.
She testified that she still experienced these symptoms even though she took her
medications and went to counseling, which she said were helpful.  On this record,
there is simply no basis for the ALJ to conclude that Siebert was "stabilized" four
months after her second hospitalization within a three month period.

The ALJ also erred in formulating Siebert's residual functional capacity by
ignoring the testimony of Siebert's treating doctors and relying instead on a

psychiatric evaluation performed by Dr. Jones on July 11, 2005.  This evaluation

was rendered more than a year <u>before</u> Siebert's alleged disability onset date of

August 6, 2006.  In addition, even Dr. Jones agreed at that time that Siebert had a

mental disability preventing her from working, and that her disability was of

twelve or more months in duration.  The ALJ also cited the evaluation performed

by Dr. Rexcoat, a one-time examining psychologist, to support his conclusion that

Siebert's major depression was "moderately well controlled with medications."

Again, the ALJ erred in relying on the results of a one-time examination

performed by a consulting psychologist instead of the opinions of Siebert's

treating physician and psychiatrist.  Dr. Rexcoat's evaluation, while at least

rendered after Siebert's claimed onset date, still predates the opinions of the

treating doctors by two years, which is especially significant given the cyclical

nature of Siebert's impairments.  Moreover, Dr. Rexcoat did not even diagnose or

address Siebert's bipolar disorder, which the ALJ acknowledged is one of

Siebert's severe impairments, and did not review her medical records.[4]  "[T]he

opinion of a consulting physician who examines a claimant once or not at all does

not generally constitute substantial evidence."  <u>Cunningham v. Apfel</u>, 222 F.3d

---

[4]Despite this, Dr. Rexcoat still described Siebert's prognosis as "guarded" and certified
that she had a disability of an expected duration of 12 or more months.

496, 502 (8th Cir. 2000) (internal quotation marks and citation omitted).  It was

error for the ALJ to formulate Siebert's residual functional capacity without

considering all of her impairments and the limiting effects of these impairments

on her activities of daily living, social functioning, concentration, persistence, and

pace.[5]  Although the ALJ is not limited to considering only medical evidence in

determining a claimant's residual functional capacity, the ALJ is "required to

consider at least some supporting evidence from a professional," because a

claimant's residual functional capacity is a medical question.  Lauer v. Apfel, 245

F.3d 700,704 (8th Cir. 2001).[6]  Because the ALJ improperly disregarded the

treating physicians' opinions and the other medical evidence of Siebert's

impairments, substantial evidence as a whole does not support the ALJ's decision

and the matter must be remanded.

Remand is also required because the ALJ improperly evaluated Siebert's

testimony under the standards set forth in Polaski, 739 F.2d 1320.  Although the

ALJ may discount a claimant's subjective complaints of pain, he may not do so on

---

[5]The ALJ combined his analysis of the severity of Siebert's impairments with his
residual functional capacity assessment.

[6]Residual functional capacity is what the claimant can still do despite her physical or
mental limitations.  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ "bears the
primary responsibility for assessing a claimant's residual functional capacity based on all
relevant evidence . . . ."  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (internal citation
omitted).

the sole ground that those complaints are not fully supported by the objective medical evidence.  Jeffrey v. Secretary of Health & Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  Thus, in assessing subjective allegations, the ALJ may consider the frequency and type of the claimant's medication or treatment, the claimant's daily activities, and the claimant's appearance and demeanor at the hearing.  Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996).  When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination using the factors set forth in Polaski.  Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered the relevant evidence.  Jeffrey, 849 F.2d at 1132.

Here, the ALJ discounted Siebert's allegations of pain as inconsistent with the medical evidence.  Credibility determinations, when adequately explained and supported, are for the ALJ to make.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  Yet here, the medical evidence supported Siebert's allegations of pain. Dr. Baker opined that Siebert suffered from "chronic disabling pain," verified by muscle spasms, reduced range of motion, and motor disruption.  Her MRI results

from November of 2008 revealed "extensive" degenerative disc disease.  Siebert

was seen by Dr. Guarino for pain management and treated with medications,

physical therapy, and injections, but the pain persisted.  She uses a cane upon her

doctor's advice to help with pain and mobility and a TENS unit regularly.  Siebert

takes four daily pain medications.  Despite this, Siebert testified that the only time

she is comfortable is while reclining.  She also stated that she has difficulty

sleeping due to pain.  Her mother confirmed these allegations.  The ALJ

concluded that Siebert's allegations were not credible to the extent they were

inconsistent with the consulting neurologist and neurosurgeon, but it was error for

the ALJ to rely on these opinions instead of those of the treating physician for the

reasons discussed above.  Siebert's consistent treatment and recurring symptoms

despite treatment support her credibility.  See Van Winkle v. Barnhart, 55 Fed.

Appx. 784, 786-87 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th

Cir. 1998) (although claimant's allegations of disabling pain may be discredited

by evidence that claimant received only minimal treatment or occasional pain

medications, such was not the case for claimant suffering from back pain who

availed herself of TENS unit, physical therapy, injections, medications, and

diagnostic testing).

      In addition, the ALJ decided that Siebert's allegations were inconsistent

with her daily activities.  In doing so, the ALJ mischaracterized the record by

calling Siebert the "caregiver for an elderly parent."  As discussed above, Verna

required only limited assistance, and her mother confirmed that they both "t[ook]

care of each other."  The evidence showed that Siebert occasionally drove her sick

mother to chemotherapy appointments or went grocery shopping when required,

but she did not go out for social outings.  It was also very draining on Siebert to

perform these tasks.  The ability to engage in some life activities despite pain does

not mean a claimant is not disabled.  Tilley v. Astrue, 580 F3.d 675, 681 (8th Cir.

2009).  Contrary to the ALJ's findings, the record also showed that Siebert and

her mother did receive assistance from others to clean the floors and perform yard

work.  The ALJ also failed to consider whether Siebert's mental impairments, in

combination with the effects of her physical impairments, aggravated her

perception of pain.  See Pratt v. Sullivan, 956 F.2d 830, 835-36 (8th Cir. 1992).

I find that the ALJ did not fulfill his duty of fully and fairly developing the

record and properly evaluating the evidence presented.  As a result, I cannot

conclude that there is substantial evidence on the record as a whole to support the

ALJ's decision.

## **Conclusion**

Because substantial evidence in the record as a whole does not support the

ALJ's decision, this matter is remanded to the Commissioner for a consideration of Siebert's claim in light of all medical records on file, including an evaluation of the opinions of Siebert's treating physicians under the appropriate standards, and development of any additional facts as needed.  The Commissioner should reevaluate Siebert's physical and mental impairments and complaints in accordance with <u>Polaski</u> and order additional testing or consultative examinations, if necessary, assess a residual functional capacity consistent with the medical and other evidence, and obtain vocational expert testimony to determine whether Siebert is capable of performing work in the national economy with her limitations.  Therefore, I reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this order.  <u>See</u> <u>Buckner v.</u> <u>Apfel</u>, 213 F.3d 1006, 1010 (8th Cir. 2000) (finding that remand under sentence four of 42 U.S.C. section 405(g) is proper when the apparent purpose of the remand was to prompt additional fact-finding and further evaluation of existing facts).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum

and Order.

A separate Judgment in accord with this Memorandum and Order is entered

this date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 21st day of September, 2012.